**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL DIVISION**

| | |
|---|---|
| **HEATHER GRABOW**, on behalf of her minor child, **M.O.**, and all others similarly situated, | Case No. 2:25-cv-3332 |
| Plaintiff, | **JURY TRIAL DEMANDED** |
| v. | |
| **GENERATION GENIUS, INC.,** | |
| Defendant. | |

## CLASS ACTION COMPLAINT

Plaintiff Heather Grabow ("**Plaintiff**"), on behalf of her minor child, M.O. ("**Plaintiff's Child**") and all similarly situated persons, alleges the following against Generation Genius, Inc. ("**Generation Genius**" or "**Defendant**"), based upon personal knowledge with respect to herself and her child, and on information and belief derived from, among other things, investigation by Plaintiff's counsel and review of public documents as to all other matters:

## I.    INTRODUCTION

1.    Protecting children's privacy is a major concern for parents in this interconnected age. In a recent survey, more than 85% of parents believe that access to technology is important for their children's future, but more than three quarters of parents are concerned about protecting their family's security, and 73% were concerned about their children's personal data being collected by third parties, without their consent.[1]

---

[1] *POLLING MEMO: PARENTS' VIEWS ON CHILDREN'S DIGITAL PRIVACY AND SAFETY,* TRUSTED FUTURE, https://trustedfuture.org/childrens-digital-privacy-and-

1

2.      These concerns are well founded. "[U]p until age 18, young people are highly vulnerable to advertising."[2] In the words of one researcher:

> There's a lot of neuroscience that explains why adolescents and children are so vulnerable [to advertising]…they're much more attuned to rewards, much less attentive to consequences and risks, much more tolerant of ambiguity, much more sensitive to social cues and much more impulsive, so they don't have a lot of cognitive control…***This is an advertiser's dream***.[3]

3.      Given these concerns, one would hope that websites catering to children would be especially careful to avoid sharing information about those children with advertisers, or at the very least, to be upfront with parents about the information they give away, so parents can decide whether the website is appropriate.  Unfortunately, that is sometimes not the case.

4.      Generation Genius is an online service that markets and sells its K-8 educational video platform to school districts, elementary school teachers, and parents seeking educational content for their children.[4] On its website, www.generationgenius.com (the "**Website**"), Defendant describes itself as a "K-8 teaching resource that brings school science standards to life through fun and educational videos paired with lesson plans, activities, quizzes, reading material and more."[5] Even though it markets to parents and teachers, the actual users of Defendant's are almost exclusively minors under the age of 14.

---

safety/#:~:text=87%25%20of%20parents%20believe%20technology,the%20lives%20of%20their%20parents (last visited Feb. 25, 2025).

[2] *Exposing the Dangers of Targeting Children as Consumers*, UC IRVINE PAUL MERAGE SCHOOL OF BUSINESS (July 3, 2024), https://merage.uci.edu/news/2024/07/Exposing-the-Dangers-of-Targeting-Children-as-Consumers.html (last visited Feb. 2, 2025).

[3] *Id.*

[4] *Meet Generation Genius,* GENERATION GENIUS, https://www.generationgenius.com/about (last visited Feb. 2, 2025).

[5] *See id.*; *Frequently Asked Questions,* GENERATION GENIUS, https://www.generationgenius.com/help/ (last visited Feb. 2, 2025).

5.     Unbeknownst to those users and their parents, including Plaintiff, Defendant harvests personally identifiable information on its child-directed video platform, including the specific videos watched by each individual user (the "**Private Children's Data**"), and contemporaneously shares that information with internet advertising giants, including Alphabet, Inc. ("**Google**") and Meta Platforms, Inc. ("**Facebook**").

6.     Giants like Google and Facebook compile Defendant's information as fuel for their targeted advertising enterprise. That data is then used to stream ads to Defendant's customers. When Google and Facebook receive information about an individual's media preferences and educational attainment, they compile it into an ever-growing advertising profile specific to the individual which they use to stream tailored ads to that person's computers and smartphones based on the individual's demography, interests, goals, and anxieties.

7.     One of the ways that Google and Facebook gather this information is through offering website operators a *quid pro quo*.  Google and Facebook offer website operators access to their proprietary suites of marketing, advertising, and customer analytics software, including Google Analytics, Google AdSense, Google Tag Manager, Meta Business Suite, and Facebook Ads (collectively, the "**Business Tools**"). Armed with these Business Tools, website operators can leverage Google and Facebook's enormous database of consumer information for the purposes of deploying targeted advertisements, performing minute analyses of their customer bases, and identifying new market segments that may be exploited.

8.     But, in exchange for access to these Business Tools, website operators install Google and Facebook's surveillance software on their website (the "Tracking Tools"), including tracking "pixels" ("**Pixels**") and third-party "="cookies" that capture sensitive, personally identifiable information provided to the website operator by its website users. This sensitive

information can include a unique identifier that Google and Facebook use to identify that user, regardless of what computer or phone is used to access the website. The Tracking Tools can also capture and share other information like the specific webpages visited by a website user, items added to an online shopping cart by a website user, information entered into an online form by a website user, and the device characteristics of a website user's phone or computer.

9.      In essence, when website operators use Google and Facebook's Business Tools, they choose to participate in Google and Facebook's mass surveillance network and, in turn, benefit from Google and Facebook's collection of user data at the expense of their customers' privacy.

10.     Generation Genius is one of the companies that has chosen to prioritize its marketing efforts over consumer privacy by installing Google and Facebook's Tracking Tools on its website.

11.     Plaintiff and each of the Class Members visited the Website and had their Private Children's Data tracked by Defendant using the Tracking Tools. However, Defendant **never** obtained authorization from Plaintiff or Class Members to share the Private Children's Data it collects with third parties. At all times relevant to this action, Plaintiff and Class Members gave no informed consent for the Private Children's Data to be transmitted to third parties, including the largest advertiser and compiler of user information, or the largest social media company on earth, which has a sordid history of privacy violations in pursuit of ever-increasing advertising revenue.[6]

---

[6] This Court will not have to look far to find evidence of Meta's violations of privacy laws. Just in May of this year the European Union fined Meta "a record-breaking" $1.3 billion for violating EU privacy laws. *See* Hanna Ziady, *Meta slapped with record $1.3 billion EU fine over data privacy*, https://www.cnn.com/2023/05/22/tech/meta-facebook-data-privacy-eu-fine/index.html (last visited Feb. 2, 2025).

12.     Moreover, Defendant's tracking of its Website users violated numerous state and federal laws, including the Video Privacy Protection Act (**"VPPA"**), passed specifically to prevent the disclosure and aggregation of data relating to an individual's video consumption, and the Children's Online Privacy Protection Act of 1998 (**"COPPA"**), enacted to protect children, like Plaintiff's Child, from being surveilled while using the Internet.

13.     As a result of Defendant's conduct, Plaintiff and Class Members have suffered numerous injuries, including: (i) invasion of privacy; (ii) lack of trust in communicating with online service providers; (iii) emotional distress and heightened concerns related to the release of the Private Children's Data to third parties, (iv) loss of benefit of the bargain; (v) diminution of value of the Private Children's Data; and (vi) statutory damages.

14.     Therefore, Plaintiff seeks, on behalf of Plaintiff's Child and a class of similarly situated persons, to remedy these harms and asserts the following statutory and common law claims against Generation Genius: violations of the Video Privacy Protection Act, 18 U.S.C. § 2710, *et seq*.; Invasion of Privacy; violations of the Electronic Communications Privacy Act, 18 U.S.C. § 2511(1), *et seq*.; violations of the California Invasion of Privacy Act, Cal. Pen. Code § 360, *et seq*.; Negligence; Breach of Implied Contract; and Unjust Enrichment.

## II.    <u>PARTIES</u>

***Plaintiff Heather Grabow and Minor Plaintiff M.O.***

15.     Plaintiff Grabow and Minor Plaintiff M.O. are citizens of the State of California, residing in Humboldt County. Plaintiff Grabow brings this action on behalf of Minor Plaintiff M.O., and on behalf of all others similarly situated.

16.     In or around 2024, Minor Plaintiff M.O. utilized Defendant's Website on the Minor Plaintiff's personal electronic devices to watch Defendant's pre-recorded video content, in the same manner as depicted in Sec. IV(C)(d), *infra*.

17.    Plaintiff Grabow never authorized Defendant to disclose any aspect of Minor Plaintiff M.O.'s use of its Website to third parties, including the Private Children's Data that Minor Plaintiff M.O. provided to Defendant by using the Website.

18.    On every occasion that she visited Defendant's Website, Minor Plaintiff M.O. was under the age of thirteen, possessed accounts with Google and Facebook, and accessed Defendant's Website while logged into those Google and Facebook accounts on the same device.

***Defendant Generation Genius***

19.    Defendant Generation Genius is a Public Benefit Corporation incorporated in the State of Delaware, with its principal place of business at 14622 Ventura Boulevard, Sherman Oaks, CA in Los Angeles County.

### III.    JURISDICTION AND VENUE

20.    This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("**CAFA**"), 28 U.S.C. § 1332(d). The amount in controversy exceeds the sum of $5,000,000 exclusive of interest and costs, there are more than 100 putative class members and minimal diversity exists because Plaintiff and many putative class members are citizens of a different state than Defendant. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein form part of the same case or controversy.

21.    This Court has federal question jurisdiction under 28 U.S.C. § 1331 because this Complaint alleges question of federal laws under the VPPA (18 U.S.C. § 2710, *et seq.*) and ECPA (18 U.S.C. § 2511, *et seq.*).

22.    This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein form part of the same case or controversy.

23.    This Court has personal jurisdiction over Generation Genius because it operates and maintains its principal place of business in this District. Further, Generation Genius is

authorized to, and regularly conduct business in, this District and makes decisions regarding corporate governance and management of the Website in this District, including decisions regarding the privacy of Website user's Private Children's Data and the incorporation of the Tracking Tools.

24.     Venue is proper in this District under 28 U.S.C. § 1391(a)- (d) because: a substantial part of the events giving rise to this action occurred in this District, including decisions made by Generation Genius's governance and management personnel or inaction by those individuals that led to the unauthorized sharing of Plaintiff's and Class Members' Private Children's Data; Generation Genius's principal place of business is located in this District; Generation Genius collects and redistributes Class Members' Private Children's Data in this District; and Generation Genius caused harm to Class Members residing in this District.

### IV.    FACTUAL ALLEGATIONS

### A.  THE CHILDREN'S ONLINE PRIVACY PROTECTION ACT OF 1998

25.     Congress passed COPPA in 1998 to codify the societal expectations of privacy with regards to minor children's usage of the Internet. COPPA is intended to "maintain the security of personally identifiable information of children collected online" and to "protect children's privacy by limiting the collection of personal information from children without parental consent."[7]

26.     COPPA "prohibits unfair … acts or practices in connection with the collection, use, and/or disclosure of personal information from and about children on the Internet." 16 C.F.R. § 312.1. Moreover, COPPA specifically prohibits "an operator of a website or online service…[from] collect[ing] personal information from a child in a manner that violates the regulations prescribed

---

[7] *Dissenting Statement of FTC Commissioner Rebecca Kelly Slaughter In the Matter of Google LLC and YouTube, LLC*, FEDERAL TRADE COMMISSION (Sep. 9, 2019), *available online at*: https://www.ftc.gov/system/files/documents/public_statements/1542971/slaughter_google_youtube_statement.pdf.

[by the Federal Trade Commission ("**FTC**")]" where the website or online service is "directed to children" or the website operator "has actual knowledge that it is collecting personal information from a child[.]" 15 U.S.C. § 6502.

27.    When passed in 1998, COPPA defined "personal information" as meaning:

individually identifiable information about an individual collected online, including--(A) a first and last name; (B) a home or other physical address including street name and name of a city or town; (C) an e-mail address; (D) a telephone number; (E) a Social Security number; (F) any other identifier that the Commission determines permits the physical or online contacting of a specific individual; or (G) information concerning the child or the parents of that child that the website collects online from the child and combines with an identifier described in this paragraph.

15 USCS § 6501 (1998).

28.    Then, in 2013, COPPA was enhanced, and its definition of "personal information" was widened to explicitly include "persistent identifier[s] that can be used to recognize a user over time and across different Web sites or online services" including "customer number[s] held in a cookie," "Internet Protocol (IP) address[es]," "processor or device serial number[s]," and "unique device identifier[s.]" 16 C.F.R. § 312.2.

29.    To comply with COPPA, website operators collecting information from children must:

provide notice on the website of what information is collected from children by the operator, how the operator uses such information, and the operator's disclosure practices for such information; and … obtain verifiable parental consent for the collection, use, or disclosure of personal information from children[.]

15 U.S.C. § 6502(b)(1)(A).

30.    In order to determine whether a website or online service is "directed to children" the FTC considers the website's:

subject matter, visual content, use of animated characters or child-oriented activities and incentives, music or other audio content, age of models, presence of child celebrities or celebrities who appeal to children, language or other characteristics of the Web site or online service, as well as whether advertising promoting or appearing on the Web site or online service is directed to children.

16 CFR § 312.2.

31.    The Defendant's video content is obviously "directed to children" under the meaning of COPPA, as it is marketed to educators and schools as educational programming suitable for children in kindergarten through the eighth grade.

32.    Accordingly, Defendant's collection and disclosure of personally identifiable information without obtaining parental permission from minor users of its Website, like Plaintiff's Child, constitutes a violation of COPPA.

### B.  THE VIDEO PRIVACY PROTECTION ACT

33.    The VPPA was passed in 1988 in response to Congress's concern that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance." S. Rep. No. 100-599, at p. 7 (1988) (statement of Sen. Patrick Leahy).

34.    In passing the VPPA, Congress was particularly alarmed about surveillance of Americans' media consumption, recognizing that:

> Books and films are the intellectual vitamins that fuel the growth of individual thought. The whole process of intellectual growth is one of privacy-of quiet, and reflection. This intimate process should be protected from the disruptive intrusion of a roving eye…These records are a window into our loves, lives, and dislikes.

*Id*. (statement of Rep. Al McCandless).

35.    Although the VPPA was originally intended to protect the privacy of an individual's rental videotape selections, Congress has repeatedly reiterated that the VPPA is applicable to "'on-

demand' cable services and Internet streaming services [that] allow consumers to watch movies

or TV shows on televisions, laptop computers, and cell phones." S. Rep. 112-258, at p. 2.[8]

36.    Under the VPPA, "[a] video tape service provider" is prohibited from "knowingly

disclos[ing], to any person, personally identifiable information concerning any consumer of such

provider" without the consumer's "informed, written consent… in a form distinct and separate

from any form setting forth other legal or financial obligations of the consumer." 18 U.S.C. §

2710(b).

37.    The VPPA defines a "video tape service provider" as "any person, engaged in the

business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of pre-recorded

video cassette tapes or similar audio-visual materials." 18 U.S.C. § 2710(a)(4).

38.    The VPPA additionally defines "personally identifiable information" as

"information which identifies a person as having requested or obtained specific video materials

or services from a video service provider." 18 U.S.C. § 2710(a)(3).

39.    Defendant is inarguably a video tape service provider under the meaning of the

VPPA, as its primary business is selling subscriptions to the hundreds of videos that it produces,

hosts, and streams on its Website. Accordingly, Defendant's disclosure of the specific videos

viewed by users of the Website, like Plaintiff's Child, constitutes a violation of VPPA. *See, e.g.*,

*Fan v. NBA Props. Inc.*, No. 23-cv-05069-SI, 2024 U.S. Dist. LEXIS 57205, at *9 (N.D. Cal. Mar.

26, 2024) ("in enacting the VPPA, 'Congress[] inten[ded] to cover new technologies for pre-

---

[8] *See also The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century*, SENATE
JUDICIARY, SUBCOMMITTEE ON PRIVACY, TECHNOLOGY AND THE LAW (Jan. 31, 2012), *available online at*
https://www.judiciary.senate.gov/download/hearing-transcript_-the-videoprivacy-protection-act-
protecting-viewer-privacy-in-the-21st-century (statement by Senator Leahy, who originally introduced the
VPPA in the Senate: "Now, it is true that technology has changed…but I think we should all agree that we
have to be faithful to our fundamental right to privacy and freedom. Today the social networking, video
streaming, the cloud, mobile apps, and other new technologies have revolutionized the availability of
Americans' information.").

recorded video content'" and "used 'similar audio visual materials' to ensure that VPPA's

protections would retain their force even as technologies evolve").

### C. DEFENDANT'S USE OF THIRD-PARTY TRACKING TECHNOLOGIES

#### a. Google and Facebook's Mass Advertising Surveillance Operation

40.    Google is the largest digital advertiser in the country, accounting for 26.8-percent

of the total digital advertising revenue generated in the United States.[9] In 2023, Google's

advertising revenue of $238 billion accounted for 77-percent of its total revenue for the year.[10]

41.    Google advertises Google Analytics and other Business Tools to website operators,

like Defendant, claiming they will allow the operator to "[u]nderstand [their] site and app users,"

"check the performance of [their] marketing," and "[g]et insights only Google can give."[11] But, in

order for website operators to get information from Google Analytics about their website's visitors,

they must allow data collection through installation of Google's Tracking Tools on their website.[12]

42.    Indeed, on its *Privacy & Terms* page, Google admits that it collects information

from third party websites, stating that "[m]any websites and apps use Google services to improve

---

[9] *Share of major ad-selling companies in digital advertising revenue in the United States*, STATISTA (May
2024), https://www.statista.com/statistics/242549/digital-ad-market-share-of-major-ad-selling-companies-
in-the-us-by-
revenue/#:~:text=In%202023%2C%20Google%20accounted%20for,21.1%20and%2012.5%20percent%2
C%20respectively    https://www.scientificamerican.com/article/7-in-10-smartphone-apps-share-your-data-
with-third-party-services/ (last visited Feb. 2, 2025).

[10]    Florian Zandt, *Google's Ad Revenue Dwarfs Competitors*, STATISTA (Sep. 10, 2024),
https://www.statista.com/chart/33017/annual-advertising-revenue-of-selected-tech-companies-offering-
search-
solutions/#:~:text=Online%20advertising&text=Alphabet%2C%20the%20company%20behind%20the,ov
erall%20revenue%20this%20past%20year (last visited Feb. 2, 2025).

[11]    *Welcome    to    Google    Analytics*,    GOOGLE,
https://analytics.google.com/analytics/web/provision/?authuser=0#/provision (last visited Feb. 2, 2025).

[12]    *See* Aaron Ankin & Surya Matta, *The High Privacy Cost of a "Free" Website*, THE MARKUP,
https://themarkup.org/blacklight/2020/09/22/blacklight-tracking-advertisers-digital-privacy-sensitive-
websites (last visited Feb. 2, 2025).

their content and keep it free. When they integrate our services, these sites and apps share information with Google."[13]

43.     Google also admits that it uses the information collected from third party websites, such as Defendant's, to sell targeted advertising, explaining to users that, "[f]or example, a website that sells mountain bikes might use Google's ad services. After you visit that site, you could see an ad for mountain bikes on a different site that shows ads served by Google."[14]

44.     Facebook operates the world's largest social media company, and the vast majority of its revenue comes from selling advertising space on its platform. In 2021, Facebook generated $117 billion, roughly 97% of which was derived from the sale of digital advertisements.[15]

45.     Facebook markets its Business Tools to website operators, claiming that that its Business Tools can:

> [H]elp website owners and publishers, app developers, and business partners, including advertisers and others, integrate and share data with Meta, understand and measure their products and services, and better reach and serve people who use or might be interested in their products and services.[16]

46.     But, like with Google, website operators using Facebook's Business Tools must install Facebook's Tracking Tools on their website. Facebook readily admits that it "receives information from [third-party] businesses and organizations," such as Defendant, and uses that

---

[13] *Privacy & Terms – How Google uses information from sites or apps that use our services*, GOOGLE, https://policies.google.com/technologies/partner-sites (last visited Feb. 2, 2025).

[14] *Id.*

[15] *Meta Reports Fourth Quarter and Full Year 2021 Results*, META, https://investor.fb.com/investor-news/press-release-details/2022/Meta-Reports-Fourth-Quarter-and-Full-Year-2021-Results/default.aspx (last visited Feb. 2, 2025).

[16]     *The Meta Business Tools*, FACEBOOK HELP CENTER, https://www.facebook.com/help/331509497253087?helpref=faq_content (last visited Feb. 2, 2025).

information to sell targeted advertising.[17] By way of example, Facebook's online *Help Center* explains that users "may see [Facebook] ads for hotel deals if [they] visit travel websites."[18]

47.    While Google and Facebook admit that they collect information from third-party websites through the Tracking Tools, neither provides, nor could provide, a publicly available list of every webpage on which their Tracking Tools are installed. As such, the vague descriptions of Google and Facebook's data collection practices referenced above could not give Plaintiff and Class Members any reason to think that Defendant was part of Google and Facebook's surveillance network. Moreover, as Defendant does not disclose its use of Google and Facebook's Tracking Tools, Plaintiff and Class Members could not have been reasonably expected to review any of Google and Facebook's privacy statements in connection with their use of the Website

48.    Google and Facebook aggregate the user information that they collect from third-party websites into "advertising profiles" consisting of all of the data that they have collected about a given user.[19] With these advertising profiles, Google and Facebook can sell hyper-precise advertising services, allowing their clients to target internet users based on combinations of their location, age, race, interests, hobbies, life events (e.g., recent marriages, graduation, or relocation),

---

[17] *How Meta receives information from other business and organizations*, FACEBOOK HELP CENTER, https://www.facebook.com/help/2230503797265156/?helpref=related_articles (last visited Feb. 2, 2025).

[18] *Id*.

[19] Bennett Cyphers & Gennie Gebhart, *Behind the One-Way Mirror: A Deep Dive Into the Technology of Corporate Surveillance*, ELECTRONIC FRONTIER FOUNDATION (2019), *available online at*: https://www.eff.org/files/2019/12/11/behind_the_one-way_mirror-a_deep_dive_into_the_technology_of_corporate_surveillance_0.pdf.

political affiliation, education level, home ownership status, marital status, household income, type of employment, use of specific apps or websites, and more.[20]

49.    In fact, Google and Facebook value user information so highly that they provide their Business Tools to many website operators for free, all to expand their surveillance apparatus.[21]

50.    When website operators, like Defendant, make use of Google and Facebook's Business Tools, they are essentially choosing to participate in Google and Facebook's mass surveillance network, and in return they benefit from Google and Facebook's collection of user data, at the expense of their website users' privacy. For example, in exchange for allowing it to collect user information, Facebook allows website operators to target customers with "dynamic advertisements" personalized to individual consumers using the user information that Facebook collects from all across the internet.[22] Likewise, Google rewards website operators for providing it with their user's information by granting access to its Analytics platform, which leverages demographic data collected by Google to provide detailed analyses of the website's user base.[23]

### b.  Children Are Specifically Targeted by Online Advertisers

---

[20]    *About audience segments*, GOOGLE ADS, https://support.google.com/google-ads/answer/2497941?hl=en#zippy=%2Cin-market-segments%2Caffinity-segments%2Clife-events%2Cdetailed-demographics (last visited Feb. 2, 2025); *Facebook Ads: Who You Can Target*, SEOM Interactive, https://searchenginesmarketer.com/company/resources/facebook-ads-can-target/ (last visited Feb. 2, 2025).

[21] *Analytics Overview*, GOOGLE, https://marketingplatform.google.com/about/analytics/ (last visited Feb. 2, 2025) ("Google Analytics gives you the tools, free of charge"); *Meta Business Suite FAQ*, META, https://www.facebook.com/business/tools/meta-business-suite/help (last visited Feb. 2, 2025) ("Meta Business Suite is a free tool").

[22] *Retargeting*, META, https://www.facebook.com/business/help/308855623839366?id=818859032317965 (last visited Feb. 2, 2025).

[23]    *Google Marketing Platform – Features*, GOOGLE, https://marketingplatform.google.com/about/analytics/features/ (last visited Feb. 2, 2025).

51.     Children are not exempted from this mass surveillance machine. As reported by Vox:

> [T]oday's kids are the most at risk because they have the largest digital footprint in history. Between the Nest cameras watching kids at home, kids' games that target them with ads, and purchase preferences on Amazon and Google, their data is being harvested at an unprecedented rate.[24]

52.     Why are advertisers willing to potentially violate COPA to collect data from minors? The answer is simple: children are particularly susceptible to advertising.

53.     Indeed, research conducted by the American Academy of Pediatrics has found that "[c]hildren are uniquely vulnerable to the persuasive effects of advertising because of immature critical thinking skills and impulse inhibition."[25] As one expert explains:

> There's a lot of neuroscience that explains why adolescents and children are so vulnerable [to advertising]…they're much more attuned to rewards, much less attentive to consequences and risks, much more tolerant of ambiguity, much more sensitive to social cues and much more impulsive, so they don't have a lot of cognitive control…***This is an advertiser's dream***.[26]

54.     In pursuit of this dream, advertisers spend more and more on advertising to children every year. In 2023, United States kids' advertising expenditures totaled nearly ***$3-billion*** – by 2031, that number is projected to reach ***$21-billion***.[27]

55.     As a result, the National Financial Educators Council notes that:

---

[24] Chavie Lieber, *Big tech has your kid's data — and you probably gave it to them* VOX (Dec. 5, 2018), https://www.vox.com/the-goods/2018/12/5/18128066/children-data-surveillance-amazon-facebook-google-apple (last visited Feb. 2, 2025).

[25] Jenny Radesky, Yolanda Linda Reid Chassiakos, Nusheen Ameenuddin & Dipesh Navsaria, *Digital Advertising to Children*, 146 PEDIATRICS 1681 (Jul. 2020), *available online at*: https://pubmed.ncbi.nlm.nih.gov/32571990/.

[26] *Exposing the Dangers of Targeting Children as Consumers*, UC IRVINE PAUL MERAGE SCHOOL OF BUSINESS (July 3, 2024), https://merage.uci.edu/news/2024/07/Exposing-the-Dangers-of-Targeting-Children-as-Consumers.html (last visited Feb. 2, 2025).

[27] *Stop Advertising to Kids – Stop Predatory Advertising*, NATIONAL FINANCIAL EDUCATORS COUNCIL, https://www.financialeducatorscouncil.org/stop-advertising-to-kids/ (last visited Feb. 25, 2025).

By the time they turn 21, young people will have been exposed to over one million advertisements – many of which are highly-sophisticated ads that encourage them to make purchases based on wants rather than needs.[28]

56.     But, if the tactics used by online advertisers are cause for alarm, the products pushed onto children through those tactics are worthy of outright panic.

57.     Researchers have found that exposure to "newer forms of digital marketing" driven by "data collection" and "personalized behavioral marketing driven by machine learning," is "associated with unhealthy behaviors, such as intake of high-calorie, low-nutrient food and beverages; use of tobacco products and electronic cigarettes; use of alcohol and marijuana; and indoor tanning."[29]

58.     The resulting harm to our children is staggering. To take one of many examples, in 1971, cigarettes were banned on television and radio when multiple studies revealed that "attention and receptivity to cigarette advertising is correlated with both current and future use [by minors]."[30] Now, over fifty years later, nicotine peddlers have adapted their product and their method by pushing e-cigarettes through data-driven "social media influencers, hashtags, music videos, and other informal social media presence" advertising.[31] As a result, the "United States is seeing an explosive rise of adolescents' vaping and the renormalization of smoking driven by a drastic increase in e-cigarette use among high schoolers."[32]

59.     Online child-targeted advertising is a big problem – but without the data collected by companies like Defendant, it would not be nearly as effective.

---

[28] *Id.*

[29] Radesky, *supra* note X.

[30] *Id*.

[31] *Id*.

[32] Kristen Jones & Gary A Salzman, *The Vaping Epidemic in Adolescents*, 117 Mo. Med. 56-58 (Jan. 2020), *available online at*: https://pmc.ncbi.nlm.nih.gov/articles/PMC7023954/.

### c.   Pixels Can Record Almost Every Interaction Between a User and a Website

60.      In order to use Google and Facebook's Business Tools, Defendant installed Google and Facebook's Tracking Tools, including tracking Pixels, onto its website.

61.      Pixels are one of the tools used by website operators to track user behavior. As the FTC explains, a Pixel is:

> [A] small piece of code that will be placed into the website or ad and define [the Pixel operator's] tracking goals such as purchases, clicks, or pageviews…
>
> Pixel tracking can be monetized several ways. One way to monetize pixel tracking is for companies to use the tracking data collected to improve the company's own marketing campaigns…Another is that companies can monetize the data collected by further optimizing their own ad targeting systems and charging other companies to use its advertising offerings.[33]

62.      Pixels can collect a shocking amount of information regarding an individual's online behavior, including the webpages viewed by the user, the amount of time spent by the user on specific webpages, the specific buttons and hyperlinks that the user clicks, the items that the user adds to an online shopping cart, the purchases that a user makes through an online retailer, the text entered by the user into a website search bar, and even the information provided by the user on an online form.[34]

63.      But most internet users are completely unaware that substantial information about their internet usage is being collected through tracking Pixels. The FTC warns that:

> Traditional controls such as blocking third party cookies may not entirely prevent pixels from collecting and sharing information. Additionally, many consumers may

---

[33] *Lurking Beneath the Surface: Hidden Impacts of Pixel Tracking*, FEDERAL TRADE COMMISSION – OFFICE OF TECHNOLOGY (Mar. 6, 2023), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2023/03/lurking-beneath-surface-hidden-impacts-pixel-tracking (last visited Feb. 2, 2025).

[34] *See id.*; *How does retargeting on Facebook help your business?*, META, https://www.facebook.com/business/goals/retargeting (last visited Feb. 2, 2025); Tom Kemp, *"Oops! I Did It Again" … Meta Pixel Still Hoovering Up Our Sensitive Data*, MEDIUM, https://tomkemp00.medium.com/oops-i-did-it-again-meta-pixel-still-hoovering-up-our-sensitive-data-f99c7b779d47#_ftn1 (last visited Feb. 2, 2025).

not realize that tracking pixels exist because they're invisibly embedded within web pages that users might interact with…Academic and public reporting teams have found that thousands of the most visited webpages have pixels and other methods that leak personal information to third parties.[35]

### d. The Pixels Installed on Defendant's Website Transmit Personally Identifiable Information to Google and Facebook

64.    Every website is hosted by a computer "server" that holds the website's contents.

65.    To access a website, individuals use "web browsers." Web browsers are software applications that allow consumers to navigate the web and view and exchange electronic information and communications over the Internet.  Each "client device" (such as a computer, tablet, or smartphone) accesses web content through a web browser (such as Google's Chrome, Mozilla's Firefox, Apple's Safari, or Microsoft's Edge).

66.    Communications between a website server and web browser consist of Requests and Responses. Any given browsing session may consist of hundreds or even thousands of individual Requests and Responses. A web browser's Request essentially asks the website to provide certain information, such as the contents of a given webpage when the user clicks a link, and the Response from the website sends back the requested information – the web pages' images, words, buttons, and other features that the browser shows on the user's screen as they navigate the website.

67.    Additionally, on most websites, the Response sent back to the user's web browser directs the browser to create small files known as "cookies" on the user's device.[36] These cookies are saved by the user's web browser, and are used to identify the website user as they browse the

---

[35] *Lurking Beneath the Surface, supra* note 33.

[36] *What is a web browser?*, MOZILLA, https://www.mozilla.org/en-US/firefox/browsers/what-is-a-browser/ (last visited Feb. 2, 2025).

website or on subsequent visits to the site.[37] For example, in a more innocuous use case, a cookie

may allow the website to remember a user's name and password, language settings, or shopping

cart contents.[38]

68.     When a Google/Facebook user logs onto their account, their web browser records

a Google/Facebook tracking cookie.[39] These cookies include a specific line of code that links the

web browser to the user's Google/Facebook account.[40]

69.     Google and Facebook's Pixels use cookies, but operate differently than cookies.

Rather than directing the browser to save a file on the user's device, a Pixel acquires information

from the browser, without notifying the user.  The information can include details about the user,

his or her interactions with the Website, and information about the user's environment (*e.g.,* type

of device, type of browser, and sometimes even the physical location of the device).

70.     Simultaneously, the Google and Facebook Pixels, like those installed on

Defendant's Website, request identifying information from any Google and Facebook cookies

previously installed on the user's web browser.

71.     The Pixel then combines the data it received from the browser with the data it

acquired from the cookie, and instructs the web browser to transmit the information back to Google

and Facebook. As a result, Google and Facebook can link all of the user information collected by

their Pixels on the Defendant's Website to the user's identity, via the user's Google or Facebook

profile.  Thus, even if a user never actually logs into a website, or fills out a form, they can still be

identified by the Tracking Tools.

---

[37] *Id*.

[38] *Id*.

[39] Cyphers, *supra* note 19.

[40] *Id*.

72.    A remarkable number of Americans possess a Google or Facebook account. According to a 2023 survey, 68-percent of Americans report that they are users of Facebook.[41] And just one of Google's many products, its Gmail e-mail client, is used by over one-third of Americans.[42] When these users visit a website, like Defendant's, that utilizes a Google or Facebook Pixel, any information collected by the Pixel can be linked to the user's identity through the Google and Facebook cookies installed on the user's web browser.

73.    However, it is not only Google and Facebook account holders that are at risk of having Pixel-collected website data linked to their identities. Rather, Google and Facebook utilize sophisticated data tracking methods to identify even those few users who do not have a Google or Facebook account.

74.    Google and Facebook's Pixels, like those on Defendant's website, can acquire information about the user's device and browser, such as their screen resolution, time zone setting, browser software type and version, operating system type and version, language setting, and IP address.

75.    An internet user's combination of such device and browser characteristics, commonly referred to as their "browser fingerprint," is "often unique."[43] By tracking this browser fingerprint, Google and Facebook are able to compile a user's activity across the internet.[44] And, as Google and Facebook continuously compile user data over time, their understanding of the

---

[41] Katherine Schaeffer, *5 facts about how Americans use Facebook, two decades after its launch*, PEW RESEARCH (Feb. 2, 2024), https://www.pewresearch.org/short-reads/2024/02/02/5-facts-about-how-americans-use-facebook-two-decades-after-its-launch/ (last visited Feb. 2, 2025).

[42] *See* Harsha Kiran, *49 Gmail Statistics To Show How Big It Is In 2024*, TECHJURY (Jan. 3, 2024), https://techjury.net/blog/gmail-statistics/ (last visited Feb. 2, 2025) ("Gmail accounts for 130.9 million of the total email users in the US"). The United States population is approximately 337.4 million. *See* UNITED STATES CENSUS BUREAU, https://www.census.gov/popclock/ (last visited Feb. 2, 2025).

[43] Cyphers, *supra* note 19.

[44] *Id*.

user's browser fingerprint becomes more sophisticated such that they need only to collect a single piece of identifying information to identify the user linked to a browser fingerprint.

76.     While debating the VPPA on the Senate floor in 1988, Senator Patrick Leahy remarked:

> [I]n an era of interactive television cables, the growth of computer checking and check-out counters, of security systems and telephones, all lodged together in computers, it would be relatively easy at some point to give a profile of a person and tell what they buy in a store, what kind of food they like, what sort of television programs they watch, who are some of the people they telephone…I think that is wrong. I think that really is Big Brother, and I think it is something that we have to guard against…

> [Privacy] is not a conservative or a liberal or moderate issue. It is an issue that goes to the deepest yearnings of all Americans that we are free and we cherish our freedom and we want our freedom. We want to be left alone.

S. Rep. No. 100-599 at pp. 5-6 (1988).

77.     Now, almost forty years later, Senator Leahy's nightmare has become reality. Through the use of Internet surveillance technology, almost every facet of our relationships, interests, aspirations, and beliefs can be tracked, recorded, and packaged for corporate profit by website operators like Defendant.

78.     Through this action, Plaintiff seeks to send Defendant, and other corporations like it, the same message that Senator Leahy elucidated during the Internet's infancy: "[W]e are free and we cherish our freedom and we want our freedom. We want to be left alone." *Id*.

    **e.   Defendant Disclosed Plaintiff's Child's and Class Members' Private Children's Data to Google and Facebook**

79.    All of Generation Genius' videos are made available to subscribers on the Website, where the videos can be "streamed over the internet…from [a] desktop, tablet or phone."[45] Plaintiff's Child all accessed the Website and viewed Defendant's video content.

80.    Unbeknownst to Plaintiff, Plaintiff's Child and Class Members, Defendant intentionally configured the Google and Facebook Pixels installed on its Website to capture and transmit the Private Children's Data that Plaintiff's Child and Class Members communicated to Defendant while watching its video content on the Website to at least four unauthorized parties, including Google, Facebook, X (formerly Twitter), and LinkedIn.

81.    For example, the following screenshots (Figures 1 & 2) depict network transmission data captured while an Internet user watches a video on the Website. Figures 1 and 2 show that when Website visitors, like Plaintiff's Child and Class Members, view Defendant's video content, the information requested and transmitted to Google by the Tracking Tools installed on Defendant's website include the title of the video (in this example, "Chemical & Physical Change For Kids | 3rd, 4th and 5th Grade"), and the URL at which the video is located.

82.    Further, the information transmitted to Google is accompanied by specific lines of code linking the information to the user's identity. As Figures 1 and 2 show, along with the Private Children's Data, Defendant's Website transmitted the identifier number attached to Google's "cid," "gid," "sid," and "tid" cookies which identify the user's Google account. Defendant's Website also transmitted information that is commonly used to create a browser fingerprint, such as the user's IP address, language selection, screen resolution, microprocessor type, internet browser software and version number, and operating system software and version number.

---

[45] *Frequently Asked Questions,* GENERATION GENIUS, https://www.generationgenius.com/help/ (last visited Feb. 2, 2025).



*Figure 1. Screenshot depicting back-end network traffic from Defendant's Website which shows information transmitted to Google when users watch a video on the Website.[46]*

---

[46] Figure 1 consists of the top and bottom halves of a single screenshot, displayed side-by-side to enhance readability. When viewed on an internet browser, the network transmission records depicted appear as a contiguous list.



*Figure 2. Screenshot depicting back-end network traffic from Defendant's Website which shows additional information transmitted to Google when users watch a video on the Website.*

83.     Likewise, the screenshot below ("Figure 3") shows that the Facebook Pixel on Defendant's Website also transmits information to Facebook when Website's users watch a video, including the video's URL, which describes the content of the video (e.g., "chemical-vs-physica-changes-video-for-kids"), the identifier number linked to Facebook's "fbp" cookie which identifies the user's Facebook account, and other information that is commonly used to create a browser fingerprint, such as the user's screen resolution.



*Figure 3. Screenshot depicting back-end network traffic from Defendant's Website which shows information transmitted to Facebook when users watch a video on the Website.*

84.     While Figures 1-3 provide one example of Defendant's use of the Tracking Tools, Defendant's disclosure of its Website's user's browsing information is not limited solely to their use of Defendant's video content. Indeed, any interaction on any page of the Website is recorded and contemporaneously disclosed to Google and Facebook in the same manner as depicted in Figures 1-3.

85.     In their default state, Google and Facebook's Pixels record and transmit only "automatic events," consisting largely of routine user behavior, such as clicking a link, clicking on an advertisement, or viewing a webpage.[47] Defendant purposely configured the Google and

---

[47]     *Automatically Collected Events*, GOOGLE ANALYTICS HELP, https://support.google.com/analytics/answer/9234069, (last visited on Feb. 2, 2025); *About automatic events*, META BUSINESS HELP CENTER, https://www.facebook.com/business/help/1292598407460746?id=1205376682832142 (last visited on Feb. 2, 2025).

Facebook Pixels on its Website to collect and transmit additional user data, including information specifically identifying the videos that its Website users watch.

86.    By installing third-party Tracking Tools, including tracking Pixels, on its Website, and by further configuring those Tracking Tools to collect its Website user's Private Children's Data, Defendant knowingly and intentionally caused Plaintiff's Child's and Class Members' Private Children's Data to be transmitted to third parties, including Google and Facebook.

### D.    DEFENDANT DISCLOSED PLAINTIFF'S CHILD'S AND CLASS MEMBERS' SENSITIVE INFORMATION TO THIRD PARTIES WITHOUT OBTAINING INFORMED CONSENT

#### a.    Defendant failed to inform Plaintiff, Plaintiff's Child, and Class Members of its disclosure of the Private Children's Data, in violation of its Privacy Policy.

87.    Defendant represemts that it "takes student privacy and security very seriously."[48] In its *Privacy Policy*, Defendant claims that it does not "request ANY personally identifying information from a child" and that the data it collects "will never be sold or rented to 3rd parties, never be publically [*sic*] displayed, and never used to make data profiles."[49]

88.    All of these statements are lies. In reality, Defendant does request and collect personally identifying information from Website users, including children, through the Tracking Tools, and simultaneously shares that information with third parties, including Google and Facebook, in exchange for compensation in the form of the valuable information available in the Tracking Tools. Then, that data is subsequently used to make data profiles for advertising purposes.

89.    Defendant breached Plaintiff's Child's and Class Members' right to privacy by unlawfully disclosing their Private Children's Data to third parties, including Google and

---

[48] *Privacy Policy*, GENERATION GENIUS, https://www.generationgenius.com/privacy/ (last visited on Feb. 2, 2025).

[49] *Id*.

Facebook. Defendant did not inform Plaintiff or Plaintiff's Child that it was sharing Plaintiff's

Child's Private Children's Data with third parties, including Google and Facebook.

90.     By engaging in this improper sharing of information without Plaintiff's and Class

Members' consent, Defendant violated its own Privacy Policy and breached Plaintiff's Child's and

Class Members' right to privacy and unlawfully disclosed their Private Children's Data.

91.     Knowing just how invasive it can be when a user's personal information is

disclosed without consent, Facebook explicitly stated, in another action pending against Facebook

related to use of its Meta Pixel on a  healthcare provider's Website, that it requires Facebook Pixel

users to "post a prominent notice on every page where the pixel is embedded and to link from that

notice to information about exactly how the pixel works and what is being collected through it, so

it is not invisible."[50]  Defendant did not abide by this policy and did not post a notice on every

page that contained the pixel.

92.     Despite never telling Plaintiff, Plaintiff's Child, or Class Members, Defendant

allowed third parties such as Google and Facebook to intercept Plaintiff's and Class Members'

Private Children's Data and use it for advertising purposes.

    **b.  The Tracking Tools Used by Defendant Were Imperceptible to Plaintiff,
        Plaintiff's Child and Class Members.**

93.     The Tracking Tools installed on Defendant's Website were invisible to Plaintiff,

Plaintiff's Child, and Class Members. Without analyzing the network information transmitted by

Defendant's Website through examination of its source code or the use of sophisticated web

developer tools, there was no way for a Website user to discover the presence of the Tracking

---

[50] *See* Transcript of the argument on Plaintiff's Motion for Preliminary Injunction in *In re Meta Pixel
Healthcare Litigation*, Case No. CV-22-03580-WHO (N.D. Cal. Nov. 9, 2022) (Hon. J. Orrick), at 19:12-
18; *see also In re Meta Pixel Healthcare Litig.*, 2022 WL 17869218 (N.D. Cal. Dec 22, 2022).

Tools. As a result, typical internet users, such as Plaintiff, Plaintiff's Child, and Class Members, were unable to detect the Tracking Tools on Defendant's Website.

94.    Plaintiff, Plaintiff's Child, and Class Members were shown no disclaimer or warning that the Private Children's Data would be disclosed to any unauthorized third party without express parental consent.

95.    Plaintiff, Plaintiff's Child, and Class Members did not know that the Private Children's Data was being collected and transmitted to an unauthorized third party.

96.    Because Plaintiff, Plaintiff's Child, and Class Members were not aware of the Google and Facebook Pixels on Defendant's Website, or that the Private Children's Data would be collected and transmitted to Google and Facebook, Plaintiff and Class Members could not and did not consent to Defendant's conduct.

## E.   DEFENDANT WAS ENRICHED BY ITS DISCLOSURE OF PLAINTIFF'S CHILD'S AND CLASS MEMBERS' SENSITIVE INFORMATION TO THIRD PARTIES

### a.   Defendant Received Material Benefits in Exchange for the Private Children's Data

97.    As explained, *supra*, users of Google and Facebook's Business Tools, like Defendant, receive access to advertising and marketing analytics services in exchange for installing Google and Facebook's Tracking Tools on their website.

98.    Upon information and belief, Defendant, as a user of Google and Facebook's Business Tools, received compensation in the form of advanced advertising and data analysis services and/or cost-effective marketing on third-party platforms in exchange for allowing Google and Facebook to collect Private Children's Data.

### b.   The Private Children's Data Had Financial Value

99.     Moreover, Plaintiff's Child's and Class Members' Private Children's Data had value, and Defendant's disclosure and interception of that Private Children's Data harmed Plaintiff's Child and the Class.

100.    According to Facebook's annual reports, the value it derives from user data has continuously risen. "In 2013, the average American's data was worth about $19 per year in advertising sales to Facebook, according to its financial statements. In 2020, [it] was worth $164 per year."[51]

101.    Conservative estimates suggest that in 2018, Internet companies earned $202 per American user from mining and selling data. That figure is only due to keep increasing; estimates for 2022 are as high as $434 per user, for a total of more than $200 billion industry wide.

102.    Several companies have products through which they pay consumers for a license to track certain information. Google, Nielsen, UpVoice, HoneyGain, and SavvyConnect are all companies that pay for browsing history information.

103.    Facebook itself has paid users for their digital information, including browsing history. Until 2019, Facebook ran a "Facebook Research" app through which it paid $20 a month for a license to collect browsing history information and other communications from consumers between ages 13 and 35.[52]

104.    The unauthorized disclosure of Plaintiff's Child's and Class Members' private and Private Children's Data has diminished the value of that information, resulting in harm to Plaintiff's Child and Class Members.

---

[51] Geoffrey A. Fowler, *There's no escape from Facebook, even if you don't use it*, THE WASHINGTON POST (Aug. 29, 2021), https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/ (last visited Feb. 2, 2025).

[52] Louis Matsakis, WIRED (Jan. 30, 2019), https://www.wired.com/story/facebook-research-app-root-certificate/ (last visited Feb. 2, 2025).

**F. PLAINTIFF'S, PLAINTIFF'S CHILD, AND CLASS MEMBERS' REASONABLE EXPECTATION OF PRIVACY**

105.    At all times when Plaintiff's Child and Class Members provided their Private Children's Data to Defendant, Plaintiff, Plaintiff's Child, and Class Members had a reasonable expectation that the information would remain confidential and that Defendant would not share the Private Children's Data with third parties for a commercial purpose, unrelated to providing them with video content.

106.    Privacy polls and studies show that the overwhelming majority of Americans consider obtaining an individual's affirmative informed consent before a company collects and shares that individual's data to be one of the most important privacy rights.

107.    For example, a recent Consumer Reports study shows that 92-percent of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumer data, and the same percentage believe those companies and websites should be required to provide consumers with a complete list of the data that is collected about them.[53]

108.    Moreover, Americans are particularly sensitive about protecting the privacy of children. In a survey conducted jointly by the Center for Digital Democracy and Common Sense Media, 90-percent of parents disagreed with the statement: "It is okay for advertisers to track and keep a record of a child's behavior online if they give the child free content[,]" and 93-percent of parents agreed that "a federal law that says that online sites and companies need to ask parents' permission before they collect personal information from children under age 13" is a "good

---

[53] *Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds*, CONSUMER REPORTS (May 11, 2017), https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety-a3980496907 (last visited Feb. 2, 2025).

idea."[54] In light of these results, it is perhaps unsurprising that 80-percent of parents of children 13-years-old or younger report worrying about their child's privacy when using online apps.[55]

109.    Personal data privacy and obtaining consent to share Private Children's Data are material to Plaintiff and Class Members.

## V.    TOLLING AND ESTOPPEL

110.    Any applicable statutes of limitation have been tolled by Defendant's knowing and active concealment of its incorporation of Google and Facebook's Tracking Tools into its Website.

111.    The Pixels and other tracking tools on Defendant's Website were and are invisible to the average website visitor.

112.    Through no fault or lack of diligence, Plaintiff and Class Members were deceived and could not reasonably discover Defendant's deception and unlawful conduct.

113.    Plaintiff was ignorant of the information essential to pursue Plaintiff's Child's claims, without any fault or lack of diligence on her part.

114.    Defendant knew that its Website incorporated the Pixels and other Tracking Tools and yet failed to disclose to its users or, where applicable their parents, that by viewing Defendant's video content through the Website, their or their children's Private Children's Data would be disclosed to unauthorized third parties, including Google and Facebook.  To the contrary, by telling its users that it "takes student privacy and security very seriously" and making other statements in

---

[54] *Survey on Children and Online Privacy*, CENTER FOR DIGITAL DEMOCRACY & COMMON SENSE MEDIA (2012), *available online at*: https://democraticmedia.org/assets/resources/COPPA-Executive-Summary-and-Findings-1635879421.pdf.

[55] *Pixalate's Harris Poll Survey Recap: Children's Privacy in Mobile Apps*, PIXALATE (Mar. 1, 2022), https://www.pixalate.com/blog/childrens-online-privacy-harris-poll-recap (last visited Feb. 2, 2025).

its privacy policy, Defendant mislead Plaintiff and the Class Members into believing that it would not disclose their information.[56]

115.    Under the circumstances, Defendant was under a duty to disclose the nature, significance, and consequences of its collection and treatment of children's and others' Private Children's Data. In fact, Defendant has still not conceded, acknowledged, or otherwise indicated to Plaintifs, Plaintiff's Child, or Class Members that it has disclosed or released the Private Children's Data to unauthorized third parties. Accordingly, Defendant is estopped from relying on any statute of limitations.

116.    Moreover, all applicable statutes of limitation have also been tolled pursuant to the discovery rule.

117.    The earliest that Plaintiff or Class Members, acting with due diligence, could have reasonably discovered Defendant's conduct would have been shortly before the filing of this Complaint.

## VI.    CLASS ALLEGATIONS

118.    This action is brought by the named Plaintiff, on behalf of Plaintiff's Child, and a proposed Class of all other persons similarly situated under Federal Rules of Civil Procedure 23(b)(2), 23(b)(3), and 23(c)(4).

119.    The Nationwide Class that Plaintiff seeks to represent is defined as follows:

**The Nationwide Class**

All natural persons, including minors, who visited Defendant's website and whose data was disclosed or transmitted to Facebook, Google, or any other unauthorized third party.

---

[56] *Privacy Policy*, GENERATION GENIUS, https://www.generationgenius.com/privacy/ (last visited on Feb. 2, 2025).

120.     In addition to the claims asserted on behalf of the Nationwide Class, Plaintiff asserts claims on behalf of a separate California Subclass, which is defined as follows:

**California Subclass**

All natural persons, including minors, residing in California who visited Defendant's website and whose data was disclosed or transmitted to Facebook, Google, or any other unauthorized third party.

121.     Excluded from the proposed Class are any claims for personal injury, wrongful death, or other property damage sustained by the Class; and any Judge conducting any proceeding in this action and members of their immediate families.

122.     Plaintiff reserves the right to amend the definitions of the Class or add subclasses if further information and discovery indicate that the definitions of the Class should be narrowed, expanded, or otherwise modified.

123.     **Numerosity.** The Class is so numerous that the individual joinder of all members is impracticable. Upon information and belief, there are at least 10,000 individuals that have been impacted by Defendant's actions. Moreover, the exact number of those impacted is generally ascertainable by appropriate discovery and is in the exclusive control of Defendant.

124.     **Commonality.** Common questions of law or fact arising from Defendant's conduct exist as to all members of the Class, which predominate over any questions affecting only individual Class Members. These common questions include, but are not limited to, the following:

a)       Whether and to what extent Defendant had a duty to protect the Private Children's Data of Plaintiff's Child and Class Members;

b)       Whether Defendant had duties not to disclose the Private Children's Data of Plaintiff's Child and Class Members to unauthorized third parties;

c)       Whether Defendant violated its own privacy policy by disclosing the Private Children's Data of Plaintiff's Child and Class Members to third parties, including Google and Facebook;

d)      Whether Defendant adequately, promptly, and accurately informed Plaintiff, Plaintiff's Child, and Class Members that the Private Children's Data would be disclosed to third parties;

e)      Whether Defendant violated the law by failing to promptly notify Plaintiff, Plaintiff's Child, and Class Members that the Private Children's Data was being disclosed without their consent;

f)      Whether Defendant adequately addressed and fixed the practices which permitted the unauthorized disclosure of Plaintiff's Child and Class Members' Private Children's Data;

g)      Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to keep the Private Children's Data belonging to Plaintiff's Child and Class Members free from unauthorized disclosure;

h)      Whether Defendant violated the statutes asserted as claims in this Complaint;

i)      Whether Plaintiff, Plaintiff's Child, and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Defendant's wrongful conduct;

j)      Whether Defendant knowingly made false representations as to its data security and/or privacy policy practices;

k)      Whether Defendant knowingly omitted material representations with respect to its data security and/or privacy policy practices; and

l)      Whether Plaintiff, Plaintiff's Child, and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Defendant's disclosure of their Private Children's Data.

125.    **Typicality.** Plaintiff's Child's claims are typical of those of other Class Members because their Private Children's Data, like that of every other Class Member, was compromised as a result of Defendant's incorporation and use of the Tracking Tools.

126.    **Adequacy.** Plaintiff will fairly and adequately represent and protect the interests of the members of the Class in that she has no disabling conflicts of interest that would be antagonistic to those of the other members of the Class. Plaintiff seeks no relief that is antagonistic or adverse

to the members of the Class and the infringement of the rights and the damages that Plaintiff's Child has suffered are typical of other Class Members. Plaintiff has also retained counsel experienced in complex class action litigation and intend to prosecute this action vigorously.

127.    **<u>Predominance</u>**. Defendant has engaged in a common course of conduct toward Plaintiff, Plaintiff's Child, and Class Members in that the Private Children's Data was unlawfully stored and disclosed to unauthorized third parties, including third parties like Google and Facebook, in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

128.    **<u>Superiority</u>.** A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claim is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

129.    Defendant acted on grounds that apply generally to the Class as a whole so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.

130.    Likewise, particular issues under Fed. R. Civ. P. 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a)   Whether Defendant owed a legal duty to Plaintiff, Plaintiff's Child, and the Class to exercise due care in collecting, storing, and safeguarding the Private Children's Data and not disclosing it to unauthorized third parties;

b)   Whether Defendant breached a legal duty to Plaintiff, Plaintiff's Child, and Class Members to exercise due care in collecting, storing, using, and safeguarding the Private Children's Data;

c)   Whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to data security;

d)   Whether Defendant adequately and accurately informed Plaintiff, Plaintiff's Child, and Class Members that the Private Children's Data would be disclosed to third parties;

e)   Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information disclosed to third parties; and

f)   Whether Class Members are entitled to actual, consequential, and/or nominal damages and/or injunctive relief as a result of Defendant's wrongful conduct.

131.    Finally, all members of the proposed Class are readily ascertainable. Defendant has access to Class Members' names and addresses affected by the unauthorized disclosures that have taken place.

### COUNT I
### VIOLATIONS OF THE VIDEO PRIVACY PROTECTION ACT
### 18 U.S.C. § 2710, *et seq.*
### *(On Behalf of Plaintiff and the Nationwide Class or, alternatively, the California Subclass)*

132.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 131 as if fully set forth herein.

133.    The VPPA provides that "a video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer shall be liable to the aggrieved person[.]" 18 U.S.C. § 2710(b)(1).

134.    "Personally-identifiable information" is defined to include "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3).

135.    A "video tape service provider" is "any person, engaged in the business, in or affecting interstate commerce, of rental, sale, or delivery of pre-recorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

136.    Defendant is a "video tape service provider" because its primary business is the production, hosting, and streaming of hundreds of videos on the Website, thereby "engag[ing] in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of pre-recorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

137.    Defendant violated the VPPA by knowingly disclosing Plaintiff's Child's and Class Members' personally identifiable information to Google and Facebook through the Tracking Tools without obtaining informed, written consent.

138.    As a result of Defendant's violation of the VPPA, Plaintiff, Plaintiff's Child, and the Class are entitled to all damages available under the VPPA including declaratory relief, injunctive and equitable relief, statutory damages of $2,500 for each violation of the VPPA, and attorney's fees, filing fees, and costs.

## <u>COUNT II</u>
## COMMON LAW INVASION OF PRIVACY - INTRUSION UPON SECLUSION
### *<u>(On Behalf of Plaintiff and the Nationwide Class or, alternatively, the California Subclass)</u>*

139.    Plaintiff repeats and realleges the allegations contained in paragraphs 132 through 138 as if fully set forth herein.

140.    Plaintiff, Plaintiff's Child, and Class Members have an interest in: (1) precluding the dissemination and/or misuse of their, or their children's, Private Children's Data; and (2) making personal decisions and/or conducting personal activities without observation, intrusion or interference, including, but not limited to, the right to visit and interact with various internet sites without being subjected to the exfiltration of their communications without Plaintiff's and Class Members' knowledge or consent.

141.    Plaintiff's Child and Class Members had a reasonable expectation of privacy in their communications with Defendant via its Website and the communications platforms and services therein.

142.    Plaintiff's Child and Class Members communicated Private Children's Data that they intended for only Defendant to receive and that they understood Defendant would keep private and secure.

143.    Defendant's disclosure of the substance and nature of those communications to third parties without the knowledge and informed consent of Plaintiff, Plaintiff's Child, and Class Members is an intentional intrusion on Plaintiff's Child's and Class Members' solitude or seclusion.

144.    Plaintiff, Plaintiff's Child, and Class Members had a reasonable expectation of privacy given Defendant's Privacy Policy and other representations.

145.    Moreover, Plaintiff, Plaintiff's Child, and Class Members have a general

expectation that the communications at issue in this Complaint, including those relating to and identifying Plaintiff's Child, would be protected from surreptitious disclosure to third parties.

146.    Defendant's disclosure of Plaintiff's Child's and Class Members' Private Children's Data coupled with individually identifying information is highly offensive to the reasonable person.

147.    As a result of Defendant's actions, Plaintiff's Child and Class Members have suffered harm and injury including, but not limited to, an invasion of their privacy rights.

148.    Plaintiff's Child and Class Members have been damaged as a direct and proximate result of Defendant's invasion of their privacy and are entitled to compensatory and/or nominal damages.

149.    Plaintiff, Plaintiff's Child, and Class Members seek appropriate relief for such injury including, but not limited to, damages that will reasonably compensate them for the harm to their privacy interests as a result of the intrusions upon Plaintiff's Child's and Class Members' privacy.

150.    Plaintiff, Plaintiff's Child, and Class Members are also entitled to punitive damages resulting from the malicious, willful and intentional nature of Defendant's actions, directed at injuring Plaintiff, Plaintiff's Child, and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.

151.    Plaintiff also seeks such other relief as the Court may deem just and proper.

<u>**COUNT III**</u>
**VIOLATIONS OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT ("ECPA"), 18 U.S.C. § 2511(1), *et seq*.**
**Unauthorized Interception, Use, and Disclosure**
<u>***(On Behalf of Plaintiff and the Nationwide Class, or, alternatively, the California Subclass*)***</u>

152.    Plaintiff repeats and realleges the allegations contained in paragraphs 139 through 151 as if fully set forth herein.

153.    The ECPA protects both sending and receipt of communications.

154.    18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

155.    The transmissions of Plaintiff's Child's Private Children's Data to Defendant's Website qualify as "communications" under the ECPA's definition of 18 U.S.C. § 2510(12).

156.    <u>Electronic Communications</u>. The transmission of Private Children's Data between Plaintiff's Child and Class Members and Defendant's Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(2).

157.    <u>Content</u>. The ECPA defines content, when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8) (emphasis added).

158.    <u>Interception</u>. The ECPA defines the interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents … include any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(4), (8).

159.    <u>Electronic, Mechanical or Other Device</u>. The ECPA defines "electronic, mechanical, or other device" as "any device … which can be used to intercept a[n] … electronic

communication[.]" 18 U.S.C. § 2510(5). The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

a.    Plaintiff's Child's and Class Members' browsers;

b.    Plaintiff's Child's and Class Members' computing devices;

c.    Defendant's web-servers; and

d.    The Pixel code deployed by Defendant to effectuate the sending and acquisition of website user communications.

160.    By utilizing and embedding the Pixels on its Website, Defendant intentionally intercepted, endeavored to intercept, and procured another person to intercept, the electronic communications of Plaintiff's Child and Class Members, in violation of 18 U.S.C. § 2511(1)(a).

161.    Specifically, Defendant intercepted Plaintiff's Child's and Class Members' electronic communications via the Pixels, which tracked, stored, and unlawfully disclosed Plaintiff's Child's and Class Members' Private Information to third parties such as Google and Facebook.

162.    Defendant's intercepted communications include, but are not limited to, communications to/from Plaintiff's Child and Class Members regarding their Private Children's Data, including the specific videos they viewed on the Website.

163.    By intentionally disclosing or endeavoring to disclose the electronic communications of Plaintiff's Child and Class Members to third parties, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

164.    By intentionally using, or endeavoring to use, the contents of the electronic communications of Plaintiff's Child and Class Members, while knowing or having reason to know

that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

165.    <u>Unauthorized Purpose</u>. Defendant intentionally intercepted the contents of Plaintiff's Child's and Class Members' electronic communications for the purpose of committing a tortious act in violation of the Constitution or laws of the United States or of any State—namely, invasion of privacy, among others.

166.    The ECPA provides that a "party to the communication" may be liable where a "communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C § 2511(2)(d).

167.    Defendant is not a party to the communication for purposes of the ECPA, based on its unauthorized duplication and transmission of communications with Plaintiff's Child and the Class.   However, even assuming Defendant is a party, Defendant's simultaneous, unknown duplication, forwarding, and interception of Plaintiff's Child's and Class Members' Private Children's Data does not qualify for the party exemption.

168.    Defendant's acquisition of sensitive communications that were used and disclosed to Google and Facebook was done for purposes of committing criminal and tortious acts in violation of the laws of the United States and individual States nationwide as set forth herein, including:

    a.    Invasion of privacy;

    b.    Breach of implied contract;

    c.    VPPA 18 U.S.C. § 2710, *et seq.*;

    d.    Violations of the COPPA, 15 U.S.C. 6501, *et seq.*; and

    e.    Violations of the California Invasion of Privacy Act ("**CIPA**"), Cal. Pen. Code § 360, *et seq.*

169.    Defendant's conduct violated 42 U.S.C. § 1320d-6 in that it used and caused to be used cookie identifiers associated with specific users, including Plaintiff's Child and Class Members, without user authorization; and disclosed individually identifiable Private Children's Data to Google and Facebook without authorization.

170.    Defendant is not exempt from ECPA liability under 18 U.S.C. § 2511(2)(d) on the grounds that it was a participant in Plaintiff's Child's and Class Members' communications about their Private Children's Data on its Website, because it used its participation in these communications to improperly share Plaintiff's Child's and Class Members' Private Information with Google, Facebook and third-parties that did not participate in these communications, that Plaintiff, Plaintiff's Child and Class Members did not know were receiving the Private Children's Data, and that Plaintiff, Plaintiff's Child and Class Members did not consent to receive their Private Children's Data.

171.    As such, Defendant cannot viably claim any exception to ECPA liability.

172.    Plaintiff's Child, and Class Members have suffered damages as a direct and proximate result of Defendant's invasion of privacy in that:

a.    Defendant received substantial financial benefits from its use of Plaintiff's Child's and Class Members' Private Children's Data without providing any value or benefit to Plaintiff's Child or Class Members;

b.    Defendant received substantial financial benefits from its use of Plaintiff's Child's and Class Members' Private Children's Data without providing any value or benefit to Plaintiff, Plaintiff's Child or Class Members;

c.    Defendant received substantial, quantifiable value from its use of Plaintiff's Child's and Class Members' Private Children's Data, such as understanding how people use its Website and determining what ads people see on its Website, without providing any value or benefit to Plaintiff, Plaintiff's Child, or Class Members;

d.    The diminution in value of Plaintiff's Child's and Class Members' Private

Children's Data and/or the loss of privacy due to Defendant making such Private Children's Data, which Plaintiff, Plaintiff's Child and Class Members intended to remain private, no longer private.

173. Defendant intentionally used the wire or electronic communications to increase its profit margins. Defendant specifically used the Pixels to track and utilize Plaintiff's Child's and Class Members' Private Children's Data for financial gain.

174. Defendant was not acting under color of law to intercept Plaintiff's Child's and the Class Members' wire or electronic communication.

175. Plaintiff, Plaintiff's Child, and Class Members did not authorize Defendant to acquire the content of these communications for purposes of invading their privacy via the Tracking Tools.

176. Any purported consent that Defendant may claim it received from Plaintiff, Plaintiff's Child, and Class Members was not valid.

177. In sending and acquiring the content of Plaintiff's Child's and Class Members' communications relating to the browsing of Defendant's Website, Defendant's purpose was tortious, criminal, and designed to violate federal and state legal provisions including a knowing intrusion into a private, place, conversation, or matter that would be highly offensive to a reasonable person.

178. As a result of Defendant's violation of the ECPA, Plaintiff, Plaintiff's Child, and the Class are entitled to all damages available under 18 U.S.C. § 2520, including statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000, equitable or declaratory relief, compensatory and punitive damages, and attorney's fees and costs.

## COUNT IV
### VIOLATIONS OF THE CALIFORNIA INVASION OF PRIVACY ACT
### Cal. Pen. Code § 360, *et seq.*
### *(On Behalf of Plaintiff and the California Subclass)*

179.    Plaintiff repeats and realleges the allegations contained in paragraphs 152 through 178 as if fully set forth herein.

180.    The California Legislature enacted CIPA in response to "advances in science and technology" that "have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications[,]" recognizing that "the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." Cal. Pen. Code. § 630.

181.    Under CIPA, it is unlawful to:

  i.    "[W]illfully and ***without the consent of all parties to the communication***, or in any unauthorized manner, read[], or attempt[] to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state;" or

  ii.    "[U]se, or attempt[] to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained[;]" or

  iii.    "[A]id, agree[] with, employ[], or conspire[] with any person or persons to unlawfully do, or permit, or cause to be done any of the acts [prohibited by CIPA.]"

Cal. Penal Code § 631(a) (emphasis added).

182.    At all relevant times, Defendant aided, employed, agreed with, and conspired with Google, Facebook and likely other third parties, to track and intercept Plaintiff's Child's and Class Members' internet communications while using the Website, specifically by installing and configuring the Tracking Tools to permit Google and Facebook to eavesdrop on and intercept in real-time the content of intercept Plaintiff's Child's and Class Members' private communications with Defendant.

183.    The content of those conversations included Private Children's Data, including the specific videos that Plaintiff's Child and Class Members watched on the Website. Through Defendant's installation and configuration of the Tracking Tools on the Website, these communications were intercepted by Google and Facebook during the communications and without the knowledge, authorization, or consent of Plaintiff and Class Members.

184.    Defendant intentionally inserted an electronic device into its Website that, without the knowledge and consent of Plaintiff, Plaintiff's Child, and Class Members, transmitted the substance of their confidential communications with Defendant to third parties.

185.    Defendant willingly facilitated Google's, Facebook's, and other third parties' interception and collection of Plaintiff's Child's and Class Members' Private Children's Data by embedding the Tracking Tools on its Website, thereby assisting Google's and Facebook's eavesdropping.

186.    The following items constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA, and even if they do not, the Tracking Tools fall under the broad catch-all category of "any other manner":

    i.    The computer codes and programs Google, Facebook and other third parties used to track intercept Plaintiff's Child's and Class Members' communications while they were navigating the Website;

    ii.    Plaintiff's Child's and Class Members' internet browsers;

    iii.    Plaintiff's Child's and Class Members' computing and mobile devices;

    iv.    Google and Facebook's web and ad servers;

    v.    The web and ad servers from which Google, Facebook and other third parties tracked and intercepted Plaintiff's Child's and Class Members' communications while they were using a web browser to access or navigate the Website; and

    vi.    The computer codes and programs used by Google, Facebook and other third parties to effectuate their tracking and interception of Plaintiff's Child's and

Class Members' communications while they were using a browser to visit the Website.

187.    As demonstrated hereinabove, Defendant violates CIPA by aiding and permitting third parties, including Google, Facebook, and their agents, employees, and contractors, to receive Plaintiff's Child's and Class Members' Private Children's Data in real time, through the Website, without obtaining parental consent.

188.    By disclosing Plaintiff's Child's and Class Members' Sensitive information, Defendant violated Plaintiff's Child's and Class Members' statutorily protected right to privacy.

189.    As a result of Defendant's violation of the CIPA, Plaintiff, Plaintiff's Child, and Class Members are entitled to treble actual damages related to their loss of privacy in an amount to be determined at trial, statutory damages, attorney's fees, litigation costs, injunctive and declaratory relief, and punitive damages.

## COUNT V
## NEGLIGENCE
### (On Behalf of Plaintiff and the Nationwide Class or, alternatively, the California Subclass)

190.    Plaintiff repeats and realleges the allegations contained in paragraphs 179 through 189 as if fully set forth herein.

191.    Through using Defendant's Website, Plaintiff's Child and Class Members provided it with their Private Children's Data.

192.    By collecting and storing this data, Defendant had a duty of care to use reasonable means to secure and safeguard it from unauthorized disclosure to third parties.

193.    Defendant negligently failed to take reasonable steps to protect Plaintiff's Child's and Class Members' Private Children's Data from being disclosed to third parties, without parental consent, including to Google and Facebook.

194.    Defendant further negligently omitted to inform Plaintiff, Plaintiff's Child, and

Class Members that it would use the Private Children's Data for marketing purposes, or that the Private Children's Data would be transmitted to third parties.

195.    Defendant knew, or reasonably should have known, that Plaintiff's Child's and Class Members' would not have provided their Private Children's Data to Defendant, had Plaintiff, Plaintiff's Child, and Class Members known that Defendant intended to use that information for unlawful purposes.

196.    Defendant's conduct has caused Plaintiff's Child and Class Members to suffer damages by having their Private Children's Data accessed, stored, and disseminated without their knowledge or consent (or the knowledge or consent of their parents).

197.    Plaintiff, Plaintiff's Child, and Class Members are entitled to compensatory, nominal, and/or punitive damages.

198.    Defendant's negligent conduct is ongoing, in that it still holds the Private Children's Data of Plaintiff's Child and Class Members in an unsafe and unsecure manner. Therefore, Plaintiff, Plaintiff's Child, and Class Members are also entitled to injunctive relief requiring Defendant to (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) provide adequate credit monitoring to all Class Members.

<u>**COUNT VI**</u>
**BREACH OF IMPLIED CONTRACT**
<u>***(On Behalf of Plaintiff and the Nationwide Class or, alternatively, the California Subclass)***</u>

199.    Plaintiff repeats and realleges the allegations contained in paragraphs 190 through 199 as if fully set forth herein.

200.    When Plaintiff's Child and Class Members provided their Private Children's Data to Defendant in exchange for services, they entered into an implied contract pursuant to which Defendant agreed to safeguard and not disclose their Private Children's Data without consent.

201.    Plaintiff's Child and Class Members accepted Defendant's offers and provided their Private Children's Data to Defendant.

202.    Plaintiff, Plaintiff's Child, and Class Members would not have entrusted Defendant with their, or their child's, Private Children's Data in the absence of an implied contract between them and Defendant obligating Defendant to not disclose Private Children's Data without consent.

203.    Defendant breached these implied contracts by disclosing Plaintiff's Child's and Class Members' Private Children's Data to third parties like Google and Facebook.

204.    As a direct and proximate result of Defendant's breaches of these implied contracts, Plaintiff's Child and Class Members sustained damages as alleged herein.

205.    Plaintiff's Child and Class Members would not have used Defendant's services had they known their Private Children's Data would be disclosed.

206.    Plaintiff, Plaintiff's Child, and Class Members are entitled to compensatory, consequential, and/or nominal damages as a result of Defendant's breaches of implied contract.

## COUNT VII
## UNJUST ENRICHMENT
### (*On Behalf of Plaintiff and the Nationwide Class or, alternatively, the California Subclass*)

207.    Plaintiff repeats and realleges the allegations contained in paragraphs 199 through 206 as if fully set forth herein.

208.    Plaintiff pleads this claim in the alternative to her breach of implied contract claim.

209.    Plaintiff's Child and Class Members conferred a monetary benefit on Defendant. Specifically, they provided their Private Children's Data to Defendant, which it exchanged for marketing and advertising services, as described, *supra*.

210.    Defendant knew that Plaintiff's Child and Class Members conferred a benefit which Defendant accepted. Defendant profited from the Private Children's Data of Plaintiff's Child and

Class Members by exchanging it for marketing and advertising services.

211.    In particular, Defendant enriched itself by obtaining the inherent value of that Plaintiff's Child's and Class Members' Private Children's Data, and by saving the costs it reasonably should have expended on marketing and/or data security measures to secure that Minor Plaintiff's and Class Members' Private Children's Data.

212.    Plaintiff's Child and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the privacy of their Private Children's Data.

213.    Under the principles of equity and good conscience, Defendant should not be permitted to retain the money belonging to Plaintiff's Child and Class Members, obtained by its surreptitious collection and transmission of their Private Children's Data.

214.    If Plaintiff, Plaintiff's Child and Class Members knew that Defendant had not reasonably secured the Private Children's Data, they would not have agreed to provide their, or their child's, Private Children's Data to Defendant.

215.    Plaintiff, Plaintiff's Child, and Class Members have no adequate remedy at law for this count. An unjust enrichment theory provides the equitable disgorgement of profits even where an individual has not suffered a corresponding loss in the form of money damages.

216.    As a direct and proximate result of Defendant's conduct, Plaintiff, Plaintiff's Child, and Class Members have suffered and will continue to suffer injury.

217.    Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff, Plaintiff's Child, and Class Members, proceeds that they unjustly received from them.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of herself, Plaintiff's Child, and other Class Members, prays for judgment against Defendant as follows:

A.  an Order certifying the Nationwide Class and California Subclass, and appointing the Plaintiff and her Counsel to represent the Classes;

B.  equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the Private Children's Data of Plaintiff's Child and Class Members;

C.  injunctive relief requested by Plaintiff, including, but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff, Plaintiff's Child, and Class Members;

D.  an award of all damages available at equity or law, including, but not limited to, actual, consequential, punitive, statutory and nominal damages, as allowed by law in an amount to be determined;

E.  an award of attorney fees, costs, and litigation expenses, as allowed by law;

F.  prejudgment interest on all amounts awarded and

G.  all such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff, on behalf of Plaintiff's Child and other members of the proposed Classes, hereby demands a jury trial on all issues so triable.

Dated: April 16, 2025                    Respectfully submitted,

                                         */s/ Catherine E. Ybarra*
                                         Catherine E. Ybarra (SBN # 283360)
                                         cybarra@sirillp.com
                                         **SIRI & GLIMSTAD LLP**
                                         700 S. Flower Street, Ste. 1000
                                         Los Angeles, CA 90017
                                         Telephone: (213) 376-3739

                                         Tyler J. Bean*
                                         Sonjay C. Singh*
                                         **SIRI & GLIMSTAD LLP**
                                         745 Fifth Avenue, Suite 500
                                         New York, New York 10151

Tel: (212) 532-1091
E: tbean@sirillp.com
E: ssingh@sirillp.com

*pro hac vice admission anticipated*